We will take up in combination the Mortimer, Avalos, and Lake actions against Lee Baca. Good morning. I don't know how the Court wants to proceed with respect to the three cases, whether I should just argue as to Oliphant at this point and reserve some time or argue as to Mortimer? I guess the principal issue arises in Mortimer in terms of the question of Manel liability, and then Avalos and Lake have a couple of additional issues, right? I think that's essentially correct. But there is something with respect to Mortimer that I think needs to be brought out with respect to the three plaintiffs, and that is that with respect to those three plaintiffs, Berry v. Baca, the appellate court decision at 379F3764 at 773 basically held that there was a right, that there was a custom, and that all that was for there to be a question of reasonableness that should be decided by the jury, and that didn't happen. And I think it just got lost. Well, you're sort of arguing a law of the case type of argument. But after Berry, when it went back, there was a lot of additional evidence that Judge Pegerson had before him before making this decision. So obviously, how does that fit into your argument? It fits into my argument the following way. Much of the data that the judge was given occurred after their particular over-detentions. Therefore, it couldn't be applied to them. It just couldn't, because what is relevant as to their over-detentions is what went on prior to that. And so, in the case of the Williams family, the Williams family, as I said already, they were part of the Williams class, actually, when they opted out of it. And because law of the case, it was decided that there was a custom that they had a due process right to be released after a reasonable time, and that all that remained was a jury question with respect to them, that it then, as to those three persons, there should have been a jury trial. Not that does not discuss the class action aspect of it. With respect to the class action and the decision that the Court came to that there would be, because there had been a decline in the number of over-detentions, it didn't suffice to be a custom any longer, at least after 2002 or 2000. There was a significant decline. However, my argument or our argument is that with respect to that, what the jail did was simply stop recording over-detention, and I think this was set forth very clearly in all of the papers, that were less than 24 to 48 hours. And that leads to the following problem, which is, number one, that they're not being counted. They're not going into their computer system for over-detentions. It's called ODER. I can't remember exactly what it stands for. And it's the second problem is that when that happens, when an inmate reception center processes over-detentions, when a clerk, say, takes 35 hours, 24 hours before they get through ages, and then for some reason or other the person is still kept there for a total of 35 hours, that's never going to be recorded. The clerk is never going to get any kind of remedial treatment or to the point that they're going to actually improve their performance because nobody's going to know about it because it's very clear that Bickley-Jones, who was one of the clerks, the head clerks in the IRC, stated that she didn't actually note or record over-detentions that were less than 48 hours and that she had complete discretion and that, as far as she knew, there weren't even any written policies on it. That gave the inmate reception center an enormous amount of leeway, but it also ends up, number one, skewing and distorting the statistics of over-detentions because we don't know how many short-term over-detentions there were, and you only find out that a clerk or that something's really wrong when somebody's over-detained for a significant amount of time. In the case of Avalos, it was 73 days. In the case of Lake, it was eight days. That's an enormously long time to be in a place that was already suffering from overcrowding, so the conditions are absolutely abysmal. Let me ask you this. You have one of the rulings that do the plaintiffs appeal the district court's grant of summary judgment against the defendants in their individual capacities because, obviously, if so, I'd like to know what your factual allegations are in the record that the individual defendants were personally involved in the plaintiff's over-detentions. You've got the Monell claims, but you also, the district court ruled against you on that you sued these defendants individually, And they had no personal, you know, they had no personal conduct with the plaintiffs in their So are you appealing, are you contesting that order? My recollection is that with respect to Lake, that's an issue. With respect to Avalos, that's an issue. And I don't think they have to have personal contact. That is not the law in this circuit. It's enough that they're a moving force in causing the violation. And obviously, although That's on the Monell, right? Yes. That's on the Monell. But you also, but there was individual. I think under Redmond, supervisorial liability can also be triggered by the same type of analysis. So what are your facts regarding the individual? Because you don't really even spend much time in the briefs. That's sort of just a throwaway there for you. So I want to know what are your individual facts. Judge Callahan, which particular, are you talking about Avalos or which case are you talking about? Well, are you, the judge said that the defendants are not responsible in their individual capacity on any of them. Yes. Are you saying that they are? I'm saying that they are. In their individual capacity, not the Monell capacity. In their individual capacity, we do contend that they are. And as to which cases and where in your briefs do you address that and what are the, what's the factual predicate? In Avalos, there, I'd have to find that in the brief, and I'd like to reserve on that to actually find the citation. But with respect to Avalos, there is very specific evidence. And part of the custom that we're containing, first of all, that has to be looked at and viewed in totos. So one of the aspects of lengthy overdetentions is the fact that they have this policy and custom of actually forcing people into poor settlements. Okay. That's Monell. That's Monell. Because Deputy Mathers, he was part of the Risk Management Bureau. I'm sorry. I missed it. I missed. Can you go back on that sentence? Yes. Deputy Mathers, for example, he was named as individual capacity. And I believe both Avalos and Lake. For example, he had, he actually signed the check that, for $500. So he had direct contact, knew about the type of poor settlement, which I contend is part of their custom at the jail, forcing settlements for very little money. It was $689 a day for, in the case of Mr. Avalos, if you, the $500 over 73 days is a very tiny amount of money. So you can say with respect to that, that policy of forcing settlements had gone at least since 2000. And obviously the supervisorial people such as Sheriff Baca knew about it because it's part of his budget. And Deputy Mathers would know about it, and the same thing with the undersheriff. They're going to know about it because they're paying this money out, and it's saving them having to have staff, extra staff, or having different policies. So is that the basis for the individual? Are those the facts you allege based for their individual? Yes. Those are part of the facts. And can I go back to another question? You kind of alluded to it at the beginning, but this has troubled me. I wonder whether Judge Progerson didn't sweep too broadly and say, okay, because the overt detentions decreased, if you accept the statistics, because they decreased over time, that means they couldn't have had deliberate indifference ever since the Vankies case, which was, I guess, 98. I wonder if that can stand when you look at the individual facts related to Hart, Berry, and Mortimer, which were in 2000. But if I'm saying, well, how could that really apply? Because that was 2008, and maybe by now, 2009, we don't have deliberate indifference. But in 2000, we were still having the problem, even by their own statistics. But then how does it stand as a class action if what we're really going to have to do is focus on each individual defendant's length of over-detention, reason for over-detention? He didn't reach whether or not he should decertify the class. He didn't rule on that. He did not rule on it, no. Well, I think you almost have two separate class actions here in the sense that the lengthy over-detentions are governed by or would have to be broken down into two segments because the lengthy over-detentions have this concomitant practice and custom and practice of coerced settlements. And I think that's very significant to those over-detentions and would not apply to, for example, one- or two-day detentions. With respect to Mortimer, Hart, and Berry, one of the things that we know is that they weren't that the jail was not keeping records of short-term over-detentions. Well, so are Hart, Berry, and Mortimer included in the numbers that the sheriff provided for 2000? No. So their cases aren't even in. I'm sorry. My hearing's not that good. Okay, so we have the statistics that the sheriff put forth to support its position that as a matter of law, the sheriff's department was not acting with deliberate indifference in 2000. Are Hart, Berry, and Mortimer included in those statistics? They could not be because they weren't recorded because they were under 48 hours. So those statistics that the jail kept didn't include Hart, Berry, and Mortimer because they weren't recording anybody. So that goes back to my question about so maybe there is a question of fact as to whether the sheriff acted with deliberate indifference as to those three individuals. But how could that sustain a class action? Plaintiff's theory is that there aren't enough people to warrant a class action. There's not between 20 – well, are there in the class of under 48 hours? The class of under 48 hours would be very, very difficult to determine because no records were kept of that. I think what you end up with is that the – but there is a class, I think, that can be determined from the actual inmates who were – over-detainees who were recorded. And that's the problem of when a jail changes the way that it records over-detentions, that you don't have that evidence. So that with respect to the Mortimer case, it becomes difficult. However, if you look at these other two cases where there's evidence, and we're talking about Avalos and Lake, you have evidence that over-detentions continued by their own recording and they were lengthy over-detentions. There weren't any kind of procedures in place to prevent those over-detentions. You have the situation whereby because there are no – because under 48 hours are not recorded, clerks are not being trained, even if they're making mistakes, because there's no evidence or record kept that they're over-detaining people for long periods. And I think 35 hours, for example, is a very long period of time to over-detain someone down there, where you have overcrowding and where the situation there was extremely beyond belief, actually. I mean, so I'm also engaged in another class action. So can I ask you a question? So Avalos was in 2004 and Lake was in 2005. Are they included in these statistics, or did they stop keeping them at that point? They kept them through 2005, and I believe they went up in 2005. And when I talk about over-detentions, I'm talking about recorded over-detentions went from, I think, 41 to 70. They actually increased in 2005. And I think other things that have to be taken into account is the fact that during this period, the jail population was substantially reduced. I think it was reduced from 21,000 to about 18,000, even below that at some point. The early release program meant that if – and when I say early release, I mean they got out, these inmates were getting out three or four months maybe before they should have, okay, or they were getting out because they couldn't otherwise – they didn't have any place to put them. They'd have to put them in a shower, for example, which happened in the Thomas case, to sleep, and – or next to a toilet in one of the cells. So they were early releasing, and it was still going on, but they were releasing people early. So that, of course, takes away a lot of stress from the clerks. But nonetheless, they still had all these lengthy over-detentions, and we don't know how many 24- to 48-hour over-detentions there were. And I think that's the major problem. What about the in-court release program in the Green Band? That seems to have had some positive effect. I'm sorry. You've got the in-court release program that began in 2001, which was associated with the Green Band program, and that was – Actually, Your Honor, you're right, and I've forgotten to mention that. That's another factor. I think that reduced the number of inmates that were going through the Inmate Reception Center by 25 percent. So, again, the basis – things were much easier for those inmate reception clerks, but they're still over-detaining people, and significantly with respect to abolition, like for very long periods sometimes. Seventy-three days is a very long period. I think there are – in the records, there are other people who are over-detained for as much as a year and months. Eight days is horrendous in that type of circumstance. We've got these two cases. I'm looking at the Mortimer case. That's 26, really, to 29 hours. Those are pretty short – relatively short periods. Relative to the over-detentions that resulted in these coercive types of settlements, yes. You're correct, Your Honor. I just want – I'm just trying to separate the cases in my mind. Mortimer didn't have any of those coercive. Those issues didn't arise in Mortimer. Nor in Hart, Berry, or Thomas. So that was in the Avalos case that you're talking about the coercive. Yeah, Avalos and Lake. Right. Yes. We're not talking about – with regard to the Mortimer case, there are no coerced settlements. The reason that there wouldn't be any coerced settlements is because they're not recorded in their computer system, which is called ODER, O-D-E-R. And because they're not recorded in ODER, there's no – only if there's a supervisor's report of over-detention on do the – does the – does the risk management bureau get involved and then this type of coerced settlement come into play and – But in Mortimer, your clients are not claiming that they got coerced settlements. Absolutely not. Because they were never recorded even as being over-detained. Well, but – okay. But whether they were recorded or not, the individuals would be able to say whether that happened to them, and they're not alleging that. They're not alleging that. So, I mean, that – I mean, if they wanted to allege that, they could say that on their own. It's not an issue of a – that's not an issue in the Mortimer case. It's absolutely not an issue. Okay. The coerced settlements is not. And I think with respect to that, it needs to be said that, for example, in Avalos, you have the situation where by – all the documents are in English, and he's Hispanic, doesn't speak English, doesn't have a certified – All right. Well, all right. Let's go to that, your allegation of that. And I think that the authority that you cite is Jones v. Tuber. And I'm wondering if you have anything else other than that to support your claim that defendants' alleged coercion of settlements constitutes a violation of the plaintiff's constitutional rights. Because, obviously, they filed lawsuits, and in those – so it didn't stop them from filing lawsuits. And when they – after filing the lawsuits, part of the – you know, part of the process of the lawsuit is going to be, you know, an action. Can they bring the lawsuit, or did they waive their right to file a lawsuit? But you're trying – you're alleging that just the settlement itself is a constitutional violation under 1983. Yes, I – yes, I am, because I'm also alleging that it's a denial of access to the court in the way that it's – But how did it keep them from going to court? They're here. This – I believe, first of all, I think with respect to Avalos, it was asserted as a defense. And, oh, yes, we're here, but, see, this is the anomalous – We're asking to – oh, right, every time someone settles a case. All right. If we were to hold that a coerced settlement is a constitutional violation, then every time someone settled a case, they would automatically be able to allege if they say coerced settlement, then they've got a 1983 violation. Whereas here, they did get to come to court. They're not being denied their access to court. Whether it was coerced or not is going to be litigated as part of the proceedings. And so it's not a small thing that you're asking to establish that – because if any – who would ever engage in settlements? Because then all someone would have to do would be allege that it's coerced, and then they've got a 1983 action. Not so simple and not so easy. This is a very specific type of coerced settlement. It only takes place in the jail and with no attorney representing the person whom they're trying to settle with. They're given documents that they maybe can't read, don't understand. There's nobody to legally interpret them. They are actually – they end up signing a tort claim for them. This is not your normal settlement. Excuse me, Your Honor. They don't give them the check. They don't give them the check. The person gets out. Then someone calls their house. They ask them to come outside. I guess there's two plainclothes. I mean, obviously, it sort of looks like the Sheriff's Department talked to a lawyer about how to do these because they're not sending four cops out in uniform with battering rams or whatever. They send two people out in plainclothes, ask them to come outside. They give them the check. Then he cashes the check. I mean, at that point, he's out of custody when he gets the check. He could go to a lawyer at that point and say, should I cash the check or not? Because it's not settled until he cashes the check, right? If he's signed off on it, it's going to be extremely difficult for him to argue it's not settled. And he's also signed a tort claim for him. He signed away his rights at that point. And they've gone out there very quickly. It's an expedited or the whole thing's expedited. You're talking about people who are not well-educated. They don't know their rights. They're intimidated. They don't know if perhaps maybe if they don't engage in the settlement, they're in this danger when the settlement process goes on while they're in the jail. But you're saying that the prosecution would have to go through the court process    whether or not the settlement process works. I guess what all right, because you're asking that to be a constant, the process that the particular procedure to establish that as a constitutional violation,  I'm saying that that is part of a custom in total of coercing settlements in order to deal with the problem of overdetentions instead of changing their practices so that there aren't overdetentions. It's not just a coerced settlement. Regular settlements do not take place in that way. People who speak Spanish. I'm reading your allegations to say that you're asking the court to hold that a coerced settlement is a constitutional violation. I'm saying that if it's used in conjunction with overdetaining a person, with their practice of lengthy overdetentions, it only comes into play if it's detention of over 48 hours. I'm saying that in that type of situation, what you have is a custom of coerced settlements and that Jones states that settlements have to be voluntary, deliberate and informed, and what I'm saying is that there are no whys. Are these particular settlements voluntary, deliberate and informed, and what you end up with is many, many people settling their cases not knowing what they're really doing, except that they're barred, and most of them are going to believe they are barred. And that's the cut. It's part of the custom of overdetaining people. And Jones v. Tabor sets forth what has to be done to make a settlement in those circumstances. We're not talking about in the outside world. In those circumstances, voluntary, deliberate and informed, and that does not exist in the way that jail has this procedure, and it's not — it's a procedure that's used by them for every case that — in which there's an overdetention. I would like to reserve that additional five minutes of the Court. Thank you. Good morning, Your Honors. May it please the Court, I'm Michael Allen of Law and Speech Allen & Choi. I was the attorney of record on the Mortimer case. With me today is Justin Clark and Scott Caron, who handled the Avalos and the Lake cases, respectively. Since there are issues that were involved in those two cases that were not involved in Mortimer, they are here to address those specific issues, which include the coercion of settlement issue, as well as the individual capacity claim liability and the civil legal claims. The claims in Mortimer, just for clarification, Judge Callahan, you have pointed out that there were individual capacity claims, and I think there was some illusion that there were individual capacity claims in the Mortimer case. Just wanted to clarify for the record, all of the individuals in the Mortimer case were dismissed, I believe, back in 2002 or prior to the previous summary judgment motion, which went up and became the Berry opinion. There was nothing in the appellant's brief or the record appealing, at least in the Mortimer case, the prior dismissals of the individual defendants. Okay. In the Mortimer case, I think that appellant is arguing sort of a law of the case from Berry to Mortimer. Can you address that? I would love to, Your Honor. The language that she pointed out and why that is not problematic for this Court to affirm the summary judgment of Judge Pragerson after taking more evidence? Yes, Your Honor. As the record will show, the Berry case, at the time of the Berry case, the Berry appeal, there was one issue that was ruled on by Judge Pragerson, and that was the first issue, that is, whether there was a constitutional violation. I should also point out at that time the case was not certified as a class action, so all you had were the individual claims. And Judge Pragerson determined based on a prior Ninth Circuit decision, Brass v. County of Los Angeles, which involved very similar facts and had a 39-hour delay, based on those facts found that there was no issue as to a constitutional violation, and therefore didn't even reach the second issue, whether or not there was a policy, practice, or custom of deliberate indifference. Therefore, the issue that was on appeal before the — in the Berry decision was that first prompt of email analysis, that is, was there a genuine issue as to a constitutional violation. So the language in the Berry decision, and I've tried to read it consistent with what was on appeal at the time, and I think if you look to the language, I mean, there is language saying that there's a jury issue as to the issue of deliberate indifference to a constitutional violation. But to the extent that the Court went beyond that and started addressing the policy, practice, or custom of deliberate indifference, that was not necessary to the holding, because that was not what was on appeal at the time. And as we set forth in our papers, something that goes beyond the holding and that is not necessary to the holding would constitute dicta. And I think that was set forth in the Ninth Circuit opinion. Sorry. Export Group v. REAP Industries. Yeah. It seems to me that the Berry panel pretty clearly contemplated that this would go to trial when they sent it back to Fragerson, to Judge Fragerson, just reading the opinion as a whole. And, in fact, you know, one of the – maybe you can help me with this. Is it this opinion, or there's still some question of whether 29 hours, 26 to 29 hours, constitutes a constitutional violation, right? I think, Your Honor, you're correct that based on the precedent, you have some cases saying, you know, 39 hours is reasonable. You have some cases saying less than 24 hours might not be reasonable. And so I think the Court said as to that first prong, it was definitely a triable issue as to whether or not the – But it said what had to go to the jury was whether a juror could find that the county's 29 hours were – removed it from the category of a constitutional violation. Correct, Your Honor. The issue that that – You wanted the jury to – I mean, see, my only problem with this at this point is that is this really appropriate, particularly as to Berry, Hart, and Mortimer, to have resolved on summary judgment? Well, I would say yes, Your Honor. And by the way, I just want to add, I've been looking forward to having the opportunity to argue before you. You swore me in a little over ten and a half years ago, so I have to admit, I'm excited to be here today. But let me respond to your question. See, what was before the Ninth Circuit before was, like I said, was there a constitutional violation? Let's assume today, for argument's sake, that they could prove at trial that there was a constitutional violation, that the delay involving Berry, Hart, and Mortimer were all excessive, unreasonable, and constituted a constitutional violation. Because the only issue in Mortimer at this point is a Monell claim, even if they prove that issue, they'd still have to prove the additional factor of a policy, practice, or custom of deliberate indifference. All right. So let's look, focusing on that issue, okay, why hasn't the, why haven't the plaintiffs, at least these three individual plaintiffs, put forth sufficient evidence of a policy at the time they were over-detained? Because I accept, I'll accept your statistics, although I understand they don't include the under 48 hours. But why haven't they shown it? Because you have the program that Judge Beisle mentioned wasn't enacted until 2001 by your evidence. So that at least creates an inference that the old program was, you know, was still at work in 2000. And you also, I mean, you point to the Bankey injunction, but the Bankey injunction was really pretty narrow. It just stopped you from, stopped the sheriff's department from holding people while they waited for the once and holds to be inputted into the computer, according to Merrick Bobb's report anyway. So there is some evidence that the changes didn't really incur until after at least these three plaintiffs were over-detained. Well, let me answer your question. And I think in answering your question, I'm also going to try to address some of the points you raised during my opposing counsel's argument. By the way, before I forget, I would like to reserve ten minutes of time for my co-counsel to answer any additional questions that the Court may have on the other issues. Okay. But moving on to answer your question, if you look at the history at the L.A. County Jail and you look at just the history of L.A. County in general, the population of L.A. County has blown up significantly since the 70s. And by the time we hit the late 90s, you had a huge, well, you still had a huge overcrowding issue at the jail, but by the late 90s, you had a significant number of inmates in the jail. It's going to be even worse if the State prison system abides by the order that was just issued. You're correct, Your Honor. At the time of the late 90s, there was an issue that the jail made a conscious decision to make a significant effort to not only reduce the number of overdetentions, but also expedite the release process. So going back even three years before 2000, there were several things that were implemented. The first thing was the overdetention and erroneous release tracking system. Now, what I find funny in this case is that my opposing counsel argues that they should have been tracking less than 24 hours or some other period of time, but I think it misses the point that the fact that they were even tracking, taking the proactive effort to track overdetentions, whatever number you set it at, was an effort to try to understand what's happening in the release process. Why are inmates, why are there delays? What are issues that we need to focus on? There's an exhibit in our file. It's on Supplemental Extracts of Record No. 58, and we have a blowup exhibit of it. And what it shows is a certain period of time, you had a high number of overdetentions back in 97. So Banner White's coming over, I guess. And you can see how it's gradually declined since 97. Even going before 2000, you can see a decline. And in addition to the overdetention and erroneous release tracking system, there were supervisor's reports of overdetentions that were prepared, which were an attempt to understand when there was an overdetention, what was causing it? What things do we need to change? And one of the things that they understood was, with respect to Barry Hart and Mortimer, inmates who were subject to the court release program, was that there were certain logistical issues that the jail was facing. There were several thousand inmates per day having to be transported to courts throughout the entire L.A. County, which includes Catalina Island, Long Beach, Santa Clarita, et cetera. And whenever a judge would issue a release order, what would happen is, at one point in time in the 90s, the L.A. Sheriff's Department used to release inmates immediately when a judge issued a release order. But what happened was the L.A. Times came out with articles saying that inmates were being erroneously released to the streets, because what would happen is you'd release an inmate when the court ordered him released, but there might be another case pending. I think it's okay. Okay. Did Judge Gregerson have that impressive chart there? Yes. We had several charts. There were going back to what I was saying was, there were inmates being released even though they might have had another case pending or another hold pending. It's typical, in fact, it's probably more often than not, inmates have multiple cases pending in multiple courts. So just because a judge orders them released on one case doesn't necessarily mean they should be released unless everything else is all clear. So that's why at the time they didn't have the technology and the computers in place at the individual courthouses to check on, well, what else is pending with respect to that inmate. So the process required inmates to be then returned back to the central jail and potentially transported back to their housing locations while the clerks who worked   And that's what happened. pieces of paperwork. And this would go on until 5 o'clock, 6 o'clock the following morning. Once the death settled, all the pieces of paperwork were processed. At that point they were able to ascertain, okay, this inmate can be released and this inmate cannot be released. But going back to the over-detention and release tracking system, what was understood was these logistical issues needed to be some solution to that. And the solution was the implementation of a computer system. Now, while Judge Ward, while you are correct, that system had not been put in place in 2001. It had been, there had been for several years technicians trying to set up the computer programs at the courthouse so that was possible. And I think if you look into the language of Oviatt v. Pierce, the Ninth Circuit decision discussing what constitutes deliberate indifference, it has to be a conscious choice among various alternatives. If it's something that's just simply a logistical problem that a county faces, I don't think that's significant to say they're making a conscious choice to, you know, deal with these logistical delays and are not doing anything about it to fix it. At the time of Barry Hart and Mortimer, the L.A. County Jail was already in the process of upgrading its computer system so that inmates could be released directly from the courts. And I should also add, there were other improvements that were taking place with respect to other types of releases during this same time. For example. You're making really good points. I can see that. You're making very good arguments and explanations for why the Sheriff's Department was reacting to various pressures and trying to solve problems. But isn't, aren't this, isn't this based on Barry, a question for the jury to decide, not the judge? Because they're factual based. And the jury question, I could see the instructions saying, did all these actions, did it rise to the level of deliberate indifference or was it a reasonable choice based on the logistics of running the department? Well, let's put it this way, Your Honor. I mean, this is the evidence that we've submitted to the court, that there's a lack of deliberate indifference. I think the existence of the over-detention and erroneous release tracking system is evidence of a lack of deliberate indifference. The supervisor's reports, lack of deliberate indifference. The modifications to the expiration, changing from a 24-hour list to a 72-hour list to earlier identify inmates. Well, I guess, I guess conceivably, obviously for you to prevail, you have to give the plaintiff or appellant in this, give their best case with all of the inferences that go with that and what you put on. And then as a matter of law, we need to be able to show that there's a lack of deliberate indifference. All right. So are, can there ever be any facts, because let's assume that they can always show that one person was held up or something. You know, let's assume that they would always be able to show that. Can there ever be facts on summary judgment where a court can say that they haven't shown deliberate indifference? I think if you had a different set of facts, I think there could be. But I think with respect to the Los Angeles County, I think it's very difficult. And I should add, that doesn't leave plaintiffs without a remedy. There are State law claims for false imprisonment. But just because there's a State, you have false imprisonment does not necessarily make it wise to the level of a Monel violation. Let me ask you. Okay. So I, I think I have a pretty good handle on all the facts that you've adduced to show that there wasn't deliberate indifference. And what the plaintiffs have shown is, in fact, they were over-detained. What other evidence have the plaintiffs put forward? Well, I think as far as with respect to the issue of whether there's a policy practice or custom of deliberate indifference, their arguments have been limited to the argument that the over-detention erroneous release tracking system is not tracking everybody. And I should note, when I refer to something, I don't call it an over-detention. I call it a potential over-detention. Just because somebody was released more than 24 hours, looking at the brass decision, does not necessarily mean the person was over-detained, which goes back to my initial point. The tracking system was just a point to try to identify where there are issues and delays. If somebody is released more than 24 hours, it could conceivably be tried before a jury and be found not to be over-detention. Right. And so should, I guess that's one of the questions that the Berry panel sent back is, was it reasonable to detain these people 26 to 29 hours in their situations? It may have been, right? It may be and it may not have been, but my point is, regardless of whether it was reasonable or not, there is no genuine issue as to a lack of policy practice or custom of deliberate indifference causing these delays. And that's the issue before the Court today. We submit that, in fact, there's a case that we cited, and I know it's not binding on the Court, but I think it involves a very similar analysis of a very similar analysis as to what we have here today. The issue was, was there a policy practice or custom of deliberate indifference? And the Court then looked at all the facts and looked at the facts that the jail made a conscious effort to try to prevent   custom of deliberate indifference.   decided not to release the plaintiffs from prison, but to do the same over detentions, made a conscious effort to try to expedite the relief process and said, and actually I should quote the language from the Court, because the last paragraph of the decision the Court actually said, over detentions are bad. Actually I'll quote it right here. That plaintiffs were not released in a timely fashion from the jail is bad. Mistakes were made, but no one is entitled to an error-free bureaucracy and deliberate indifference. The federal constitutional standard is a high standard. As a matter of law, the record does not show that defendants were deliberately indifferent to plaintiffs' right to be released to be ordered. Instead, the evidence indicates that the errors that led the plaintiffs over detentions were caused by, at worst, the non-supervisor defendants' unfortunate lapses, which were mainly caused by the cuts in staff and budget for the jail, a problem which the supervisory defendants did not ignore, but undertook to address during the pertinent time. All right. If we accept your argument that what we're deciding is what is the evidence on deliberate indifference, all right, you're basically saying whether they were over detained or not, that could be a tribal issue. But what is the evidence in this record from the plaintiff's perspective with all favorable inferences on deliberate indifference? The evidence in this record, which can be found in the Supplemental Excerpts of Record, pages 24 to 28, include a number of various improvements that were made since 1997, starting with the All right. But that's your evidence. What evidence did plaintiff put on deliberate indifference? You're saying the mere fact that they were potentially over detained is not evidence of deliberate indifference. Am I I'm sorry. Well, I'm understanding you to say just the fact that they were, you know, if they were over detained, let's assume that they can show that. You said that's not evidence of deliberate indifference. No, because I think what they have to show is a policy practice or custom of deliberate indifference. And what evidence did they present on that? I don't believe they presented any evidence that there was a policy practice or custom of deliberate indifference. What they produced was numbers of over detentions. But when you compare the total numbers of over detentions to the number of inmates released per year, we're talking less than one per 1,000 of every single inmate released from the jail. So they did present that evidence. It is evidence. So you would say, so just so I understand your argument, you're saying that that's the evidence that they presented, but as a matter of law, with what you presented It's not so persistent and widespread to amount to a custom. It's a very rare occurrence when they happen. So I read also in the Merrick-Bodd 17th Annual Report that in 2000 there was a new person who came in and started reviewing the over detentions. Was that, what was the significance of that? I'll have to refresh my recollection. If it may be referring to the Green Ban Program. No, it's, I think it was on, it's, oh, maybe it is Green Ban. That started in 2000. 2001, I think. Starting in 97, there was a big drop of over detentions down to 2000, and then it kind of plateaued, and then in 2001 you had the court release, and then it started down again. Correct. Yeah, I mean, there have been various, with respect to the ESP releases, I believe Thomas, who was the fourth plaintiff added to this case late in the game, he was in the EXP release. EXP stands for expiration of a sentence. So I included the data on the... He was in 2004, if I remember correctly. Correct, correct. So he was way late in terms of... Correct. But with respect to Perry Hart and Mortimer, prior to 2000, or in 2001, you had the tracking system, you had the supervisor's reports, you had a new 26-week program that was to train all new staff assigned to the jail. You had monthly team briefings among the... That's what I'm talking about. Commander Richard Berantes became captain of IRC in 2000. Is that when... He replaced former captain Charles Jackson, who in fact submitted a declaration, which is part of the record here. And he, I think, picked up where Jackson left off in terms of making the various improvements to the release process. I think if the Court looks at the statistics and looks at the various improvements described, there's a clear correlation between the significant drop in number of overt detentions and the improvements made. And the drop didn't begin after 2001. It didn't begin after 2000. It began starting in 97. The drop was already there. The efforts were already there. All right. So what do you make of the argument that you only have this drop in the statistics because you didn't keep statistics for people who were over-detained less than 48 hours? Great question, Your Honor. I'd love to answer that one. In fact, I think if the Department had chosen 48 hours as a benchmark instead of 24 hours, I think that drop that you see in that chart would have been magnified. You might have seen a higher number early on in the years. It might have captured some additional numbers. But I think as you get into 2001, 2002, 2003 and on, the numbers would be virtually the same. Because as of now, because inmates are released directly from the courthouses, you know, they're being released, you know, less than eight hours after the, you know, I mean, if they go to court at 8 o'clock in the morning, they're going to be released before 5 o'clock in the afternoon, the latest. So you're saying that they keep statistics for anybody over-detained over 24 hours? Correct. And I should clarify that. The 24-hour time frame really is kind of a nebulous time frame in terms of describing when does that clock start. And if you look at the numbers for Berry, Hart and Mortimer, I think it was less than 24 hours from the moment that the paperwork was entered into the computer system. As I mentioned to you before. It can't be from when the judge says the words because you still have to sit in court and then you have to go back somewhere. The clerk has to put something in. Right. And so the clock began once the jail was put on notice. This inmate is entitled to be released. Let's begin the release process. We have several. I notice here we have one beginning time when the judge said the words, another beginning time when it was put into the system. Right. And I think what the jail would look at is, well, when do we put on notice that we need to begin this release process? And that's when the clock would start. I think it would be unfair to put the jail to a standard which starts the clock when the judge says it if, in fact, they don't have the capability of looking at what other holds or wants or everything else is pending. So I should add that. I wanted to just add that one point. Well, for instance, in Mortimer, the judge said the words 29 hours before release, but it was 17 hours after it was released, after it was put into the system. So there is a difference. Correct. So that's why they were not put in the system. If in that particular example you gave, Your Honor, it had been eight hours longer, they would have been in that tracking system. But I think, once again, it goes back to my point. The tracking system, the point of it was not to say these people are being over-detained, these ones aren't. It was just trying to understand what's going on in this release process. You know, where are inmates falling along the continuum? And by understanding that, improvements were able to be made. And so that's the point. Correct. And I would like to add, I notice I'm running low on time. If the Court has any questions from my co-counsel, I'd like to reserve that time. All right. So did you want to, I mean, you've taken up most of the time, Mr. Elm, I think, on the most significant issue, but do your co-counsel want to discuss the issue specific to Lake and Avalos? Good morning, Your Honors. I'm Scott Herron, and I handled the Lake case on behalf of the defendants. I just have two very quick points, and I'll be brief. With respect to the claim for denial of access to the courts, I just want to clarify that in the Ninth Circuit, a claim for denial of access to the courts is a claim for denial of access to the court. A claim for denial of access to the courts requires not only a showing of some official action that frustrates a plaintiff in bringing the claim, it also requires a showing that the official action actually resulted in a failed attempt to litigate the claim. In other words, there has to be some showing that there was an attempt to litigate the underlying claim and that that attempt failed. And the citation for that is DeLue v. Wagner. It's actually a case that was cited by the appellant in Lake, in the opening brief in Lake. So I think the district court was correct in holding that the proper procedure is to bring the underlying claim. And if there's a question about the voluntariness of the settlement agreement, it's litigated within the context of the underlying claim, and if that procedure is followed. I'm understanding appellant plaintiff to be arguing that Jones v. Tuber supports a supports the claim that coercion of the settlement constitutes a violation of plaintiff's constitutional rights. Am I? It's a little unclear. I don't know if I exactly heard appellant say that, but that's what I understood appellant was claiming in preparing for court. That is the plaintiff's claim. I don't believe that Jones v. Tuber stands for that proposition. I think in Jones v. Tuber, the plaintiff brought the underlying claim, brought the excessive force claim, and then litigated the question of whether or not the settlement agreement was voluntary within the context of that claim. And the district court, I think, correctly pointed out that that's the procedure that was followed in Jones, and that is the correct procedure. And under the rule of the Ninth Circuit, I think that that's the correct procedure. And if you think about it, if that procedure is followed, a settlement agreement will never result in the denial of access to the courts. If the claim is brought, the underlying claim is brought, one of two things will happen. Either the court will enforce the settlement agreement, in which case there was no constitutional violation in the first place, or the court will not give effect to the settlement agreement and there's no denial of access. So if that procedure is followed, it never will result in a denial of access. Did you raise the settlement as a defense in your answer to the Lake and Avalos claims? It was raised as a defense in the answer in both Lake and Avalos. It was raised in the motion for summary judgment in Avalos. It was not raised in the motion for summary judgment in Lake. But I think that the district court was pretty clear. It was telegraphed into the plaintiff in the motion for judgment on the pleadings in Lake that I'm going to hear your claim for coercion of settlement. If you think that you've been coerced and the defendant raises it as a defense, I'll hear your defense, I'll hear your arguments and decide it in that context. With respect to just very quickly with respect to the Lake motion to dismiss, which disposed of the conspiracy claims and the individual capacity claims, the problem with both the conspiracy claims and the individual capacity claims is that the claims were the allegations were conclusory. I'd like to point the Court to a very recent Supreme Court case. It's Ashcroft v. Iqbal. It's I-Q-B-A-L. It's so recent that we don't even have an official study. Does it have retroactive effect? Can Iqbal have retroactive effect? I mean, it's imposing such draconian requirements. It actually refers to prior cases. I know it does. I don't think anybody who's read it thinks that it hasn't altered the law somewhat. I think the point is that it doesn't apply any kind of heightened pleading standard under Rule 8. I think that it's a direct application of Rule 8. And the holding is that, you know, when you have allegations that are just threadbare allegations of the elements of a claim supported by mere conclusions, those are not only are they not sufficient to survive a motion to dismiss, but they also are not afforded the presumption of truth that is normally afforded plaintiff's allegations in a complaint. And that's the basic problem with the allegations in the late complaint. I also just want to point out, too, that in the late complaint, there are the first amended complaint, there are no allegations of individual involvement by any defendant aside from Defendant Baca, and there are no allegations of conspiracy involving any individual defendant aside from Defendant Baca. The conspiracy allegations claim that Defendant Baca conspired with the Derby defendants. And that's why I would just point the Court to Appellant Excerpts of Record at 51 through 52, the first amended complaint, paragraphs 14, 15, and 22. Unless the Court has any questions, I have nothing further. All right. Now, I'll give your co-counsel, who would that be, Mr. Did you want to say something? Just very, very briefly. All right. Good morning, Your Honor. It's Justin Clark, also known occasionally as Vanna White. Just very, very briefly. I know the majority of the Court's discussion here today is obviously focused on the over-detention issues and, to a certain extent, a little bit of coercion of settlements. But I also just want to reiterate for the purposes of the Court's consideration that with respect to the RICO claims that are at issue in the Avalos case, that there is absolutely no proof in the record of a concrete financial loss. Well, now, I think that Diaz was the case that I think was cited in that situation, which I think I was in the dissent on. But nevertheless, the majority is controlling. But here, you're saying the barrier for this individual is he's illegal and he doesn't have a work permit, so that he can't prove that element of RICO? It's more than just that, Your Honor. It's also, and in fact, while there has been a more recent pronouncement regarding the standing requirements in the Ninth Circuit for proof of a concrete financial loss, and that is Canyon County, which is at 519 F3rd 969. And in Canyon County, this Court actually reaffirmed that concrete financial loss requirement. It has to be something more than just speculation. It has to be something more than just even a harm to an intangible property interest. And here, the allegation even in the complaint is just a speculative harm to some employment interest, which isn't even really defined in the complaint. And the complaint is in the record, I believe, at Plaintiff's Excerpt 60, paragraph 40. For purposes of establishing RICO standing, we just need something more than that. I mean, and one of the considerations that the Court should keep in mind in addressing this issue is the potential dramatic expansion of the RICO statute as a whole. And in fact, Judge Wardlaw, you were recently on a panel that recognized that as a concern and recognized that one of the issues that should be considered is whether or not there is proof of a concrete financial loss. And here we just don't have it. For the Court's record, it was the Thomas v. Baca case, and that's Ninth Circuit case number 0606981. In addition, and this came up briefly, and then I will sit so that we can finish, it came up briefly that there is no evidence in the record of any individual participation by any of the defendants in the Avalos case. And while Judge Pregerson never reached the issue of qualified immunity, even had he not simply ruled that summary judgment was appropriate on other grounds with respect to the RICO case and the Monell liability, he easily could have found that qualified immunity was appropriate. Thank you very much. Thank you, counsel. Ms. Yagman, you have five minutes. Five minutes. With respect to the West v. Tillman case, that didn't involve a Monell custom practice because I believe in the Eleventh Circuit in that particular State, the sheriff had eleventh immunity. Had eleventh... Amendment immunity? Yes. I'm sorry. Sovereign immunity? Are you talking about? I'm sorry. Are you talking about State sovereign immunity? Yes. I had State immunity from yes. Like Eleventh Amendment immunity? Is that what you're saying? I'm trying to say yes. I'm not succeeding very well. So there was no Monell in that particular case. It was just whether or not the individuals were liable in their individual capacities. And with respect to the short-term overdetentions, my understanding I believe it set forth in the various briefs is that the clerical staff received at least until after the processing was concluded with entry into aegis of all wants and wants before they'd start to record an overdetention. So the whole period could take as long as they wanted to do that before it would start to count. And I think that there's something fundamentally wrong with that, that they can take, as I said, a total of 48 hours that they start to record them. They could take 47 hours to process this person through and just keep them there. There'd be no record of it. And I think that's a significant amount of time to have to spend there. With respect to the coerced settlements, what that really goes to is the custom. And it's a custom combined with overdetaining people for significant lengths of time and using these coerced settlements, and they are coerced, to deal with the problem. Do you think that goes to the Monell issue? That goes to the Monell issue. Can it go to the Monell issue on Mortimer, or can it only go to the Monell issue on Adams? It goes only to the Monell issues on Avalos and Lakes. It wasn't raised in Mortimer, and it couldn't be raised in Mortimer because the plaintiffs there were any short-term overdetainees. They weren't detained for that long a period of time. Okay. I just want to make sure that we're not missing. Yeah. The sides are saying different things about when the overdetention is recorded. I heard the Baca lawyers say that if they started recording 24 hours after the – they would record an overdetention if it went 24 hours after the jail learned of the release. But you're saying they didn't start recording until 48 hours after the prison learned of it. Absolutely. That's absolutely so. And I think that if you look at the evidence that the – Can someone point me to which is it in the record? Well, it's in the record in the various – the sealed documents show that only two-day overdetentions are – two-day or more overdetentions are recorded by them. So you will not find – there was maybe one in 2000, one in 2001. And they were really a couple, a total of 14 in the whole – during the entire period from 2000 through 2005 where you had one-day overdetentions. And when you really looked at them, they often were two-day overdetentions. The only recorded overdetentions are actually in the sealed documents. They're for more than two days or more. And so anything under two days was – 48 hours was not recorded. And this gives them – But 48 hours from what starting point? But it has to be. A person's overdetained legally the minute – they have to have a reasonable time to process the night. We would admit that. So perhaps you would say they have 12 hours to process the night. And I think that's only – if they have 24 hours to process the night, then that means that they're out of the door in 24 hours. Not from the time that the court says you're released, 24 hours. But that was not happening at the jail, because what they would do is they wouldn't count the time between when the court said you're released and the time that they actually had gone through AGIS and checked for wants and warrants. Now, that really wouldn't really apply too much after 2001 because people had been released pretty expeditiously from the court. So that shows that they didn't need to take that long. What was happening is, however, if you had an expired sentence or somebody's parole had been released back, you know, onto parole or whatever, for whatever reason, at the jail itself, they had – were then taking all this time, potentially, as in the Mortimer Berryhart case, which they weren't released from court, to release people, and longer than that probably, and they wouldn't record it. And they didn't record it, and we know that because they didn't record Berryhart and Mortimer. So we know that they weren't recording them. And we know that they were just taking a really, really long time to do it. And that does lead to the problem of nightly overdetentions because clerks aren't getting training who persistently take a long time. Those people wouldn't be spotted, they wouldn't get any training. It's a defective policy. There is no policy at all that they set forth, and all the policies were set forth, that prevented people from being detained, over-detained, for long periods of time. You could be – you could be like Babalos and stuck in a cell under horrendous conditions for 73 days, and you just didn't get out. And this was not the Hotel California, which is where I guess we're standing. It just – they couldn't get out. And they wouldn't know why if they didn't speak English and could breathe. They just didn't know. It's really, really an abysmal circumstance. And I think there are enough people who were in the cell documents who were over-detained for long enough periods of time, who were forced into settlements, to show a custom and policy of delivering indifference. Well, thank you, Your Honors. Thank you very much. Does Counsel – do you have, Mr. Allen, the number or the explanation? Your Honor, I'm looking in the declaration of Richard Berantes, and it's in the supplemental excerpts of record, pages 24 through 25. And it's in paragraph 21. He specifies that the tracking is 24 hours, not 48. All right. All right. Thank you, Counsel. Thank you. Thank you for your argument on both sides. And Mortimer, Avalos, and Lake v. Baca will be submitted. And this Court is in adjournment for today. All rise. This Court is adjourned.
judges: Wardlaw, Callahan, Beistline